UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN LANIER,

                Plaintiff,                          Case Number 08-11842
                                                     Honorable David M. Lawson

v.

METROPOLITAN LIFE INSURANCE
COMPANY,

                Defendant.
_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO REVERSE PLAN ADMINISTRATOR'S DENIAL OF BENEFITS AND DENYING DEFENDANT'S MOTION TO AFFIRM PLAN ADMINISTRATOR

Among the benefits plaintiff John Lanier received from his employer, BearingPoint, Inc., was long-term disability insurance coverage underwritten by defendant Metropolitan Life Insurance Company. Lanier applied for disability benefits in 2002. He was granted short-term benefits for six months beginning in October 2002. Thereafter, he applied to MetLife for long-term benefits; MetLife was his company's benefits plan administrator in addition to the insurance underwriter. Following a thirty-six-month period in which benefits were paid, MetLife initially denied the claim, but then granted it after Lanier filed an administrative appeal. Eight months later, after obtaining opinions from new consultants (although it does not appear that new data were considered), MetLife terminated Lanier's long-term disability benefits. After having his administrative appeals denied, Lanier filed the present matter under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* The parties filed cross motions on the administrative record, and oral argument was held on June 30, 2009. The Court has reviewed the administrative record and the parties' submissions and now concludes that the plan administrator's determination that the plaintiff

was not disabled within the meaning of the plan and was not entitled to long-term disability benefits was arbitrary and capricious, because the defendant did not consider or discuss the finding by the Social Security Administrator that the plaintiff is disabled; gave preemptive weight to the opinions of non-examining consulting physicians who found no positive objective findings of any ailment that could account for the plaintiff's pain, despite abundant evidence in the record otherwise; discounted the findings and opinions of the plaintiff's treating physician without justification for doing so when the physician correlated his clinical findings with the results of objective testing; and applied a standard for disability that appears to be more rigorous than required by the plan. Therefore, the Court will grant the plaintiff's motion to reverse and award benefits and deny the defendant's motion to affirm the plan administrator.

<div align="center">I.</div>

John Lanier is presently forty-five years old. Since college, he worked as a manager and software engineer. He took a job with KPMG Consulting, Inc. in 1999 and remained with that company until he left on disability leave in October 2002. Earlier that year, KPMG Consulting became BearingPoint, Inc.

At the time of the plaintiff's departure, BearingPoint maintained an employee benefit package that included both short-term and long-term disability benefits. Under the plan, an employee is considered disabled if during the first three years following an elimination period the employee is "unable to perform the material and substantial duties of [his] Own Occupation," and is under a doctor's care. Thereafter, the employee is not considered disabled unless he is "unable to perform any job for which [he is] qualified or for which [he] may become reasonably qualified taking into account [his] training, education or experience." AR 13.

Lanier states that during his younger years he was a "very active," healthy individual without major health issues, enjoyed sports, and was a "good athlete." AR 297, 520. He did not drink or smoke and maintained a healthy lifestyle. AR 556. However, his medical history shows that in his early twenties, Lanier began to experience back pain that progressed to the point that he had difficulty performing the mild exertional demands of his job, which consisted of "[e]xtensive travel, walk[ing], sit[ting], lift[ing] & carry[ing] computer [and] luggage." AR 485. Lanier was required to travel by plane or car; lift 10-20 pounds; carry 10 pounds; pull 30-40 pounds; and push 30-40 pounds on "daily/weekly" basis. *Ibid.*

The plaintiff underwent several surgeries to alleviate his back conditions. In 1999, he underwent a lumbar diskectomy and laminectomy. In 2001, a sports injury led to another laminectomy and diskectomy. At the time Lanier became disabled in 2002, his treating physician diagnosed him with chronic cervical and lumbar pain, left lumbosacral radiculopathy, "congenital narrowing of the spinal canal in the lumbar region," "fibromyalgia-like features that he has had for multiple years where he has had chronic migratory pain," "anatomical abnormalities with multiple impairments in the cervical and lumbar region that are objective in nature," "advanced degenerative arthritis of the lumbar spine at multiple levels," "disc protrusion and spondylosis from C3 all the way through T2, that is multiple levels of degenerative arthritis," "bilateral ulnar neuropathy at the elbows," and "dysfunctional sleep-wake cycle." AR 195-96, 198, 414-15. In addition, the plaintiff was diagnosed with anxiety disorder and depression. AR 415.

Lanier's last day of work for BearingPoint was October 8, 2002. He applied for and received short-term disability benefits from MetLife, covering the period from October 9, 2002 through March 16, 2003. MetLife extended his short-term disability benefits retroactively through April 6,

2003, which was the maximum time allowed under the plan, and referred his file to a long-term disability benefits case manager.

The plaintiff then applied for long-term disability benefits on account of "severe fibromyalgia . . . , osteoarthritis of the lumbar spine and degenerative disc disease." *See* Dr. Paul Valle Note, 2/20/2003, AR 141. On June 4, 2003, MetLife approved the plaintiff's LTD benefits claim effective April 7, 2003. Lanier received his LTD payments for thirty-six months in the amount of $6389.21 per month, which was two-thirds of his income at BearingPoint.

Six months before the thirty-six-month period expired, MetLife sent Lanier a letter on October 26, 2005 stating that it would not approve LTD benefits beyond April 6, 2006. MetLife had received and relied on (a) office visit notes dated April 25, 2005, July 26, 2005, and August 25, 2005 from the plaintiff's treating physician, Dr. Geoffrey K. Seidel, a physical medicine specialist at Pain Management & Rehabilitation; (b) prescription requests to pharmacy dated June 11, 2005 and July 1, 2005; (c) Dr. Seidel's attending physician statement from August 25, 2005; and (d) Dr. Seidel's physical capacity evaluation dated August 25, 2005. It appears that the defendant placed great weight on Dr. Seidel's August 25 physical capacity evaluation, which MetLife read as stating that the plaintiff could sit for six hours and stand and walk each for one hour. This evaluation differed from a previous evaluation performed on January 9, 2003 by Dr. Brenda Andritsis (Lanier's primary care physician) stating that the plaintiff could sit only for four hours intermittently, stand for one hour intermittently, and walk for one hour intermittently. Relying on Dr. Seidel's evaluation, MetLife concluded that the plaintiff could perform sedentary jobs including chief bank examiner, controller with the Department of Transportation, and credit and collection manager. MetLife also

relied on an employability assessment by vocational rehabilitation consultant Mary L. Hale on October 20, 2005, which in turn placed great weight on Dr. Seidel's evaluation.

The plaintiff appealed MetLife's October 26, 2005 decision in March 2006, attaching a new report from Dr. Seidel, in which the physician corrected misstatements in his earlier physical capacity evaluation. Lanier also had applied for Social Security disability benefits, as the plan required him to do, and he received a favorable determination. There were additional diagnostic tests performed as well, and the plaintiff informed MetLife of all of this new information. The new tests described by Lanier included:

- September 22, 2005 electrodiagnostic tests confirming chronic left radiculopathy and revealing no changes since the 2003 tests;
- September 28, 2005 electrodiagnostic tests revealing bilateral ulnar neuropathy in both left and right elbows;
- September 23, 2005 magnetic resonance imaging ("MRI") of lumbroscal spine confirming "previous congenital and chronic disc disease diagnosis and provid[ing] further evidence of Dr. Seidel's spinal nerve root compression diagnosis";
- September 26, 2005 MRI of the cervical spine confirming "worsening condition of multi-level degenerative disc disease and stenosis when compared to the 2003 MRI."

AR 275.

In his updated report of December 5, 2005, Dr. Seidel amended his earlier evaluation, writing:

I completed attending physician report for MetLife and on page 2 for the physical capabilities Item A, I had answered sitting four hours per day. I had to carry it over a prior answer that had been provided several years before.

[Lanier] states to me that he has been denied disability insurance because of that answer.

I empathize that answer was an error and I am clarifying that answer today.

John Lanier states to me that he can only tolerate sitting for one to two hours per day working at a computer in a seated position. He must get up multiple times and he was getting headaches as he attempted to try this process. His back pain became unbearable and radicular symptoms became unbearable.

He tends to lean on his elbows to support his back, minimize pain and it had resulted in ulnar neuropathy at the elbows. He must avoid leaning on his elbows, so it is impractical for him to work.

I note that he attempted to have chiropractic care to see if that would help once and he states that sometimes it helps and sometimes it does not.

The only way that he is able to sit in one place is when he is sacral sitting in a recliner in which he has head support. It is not a practical work environment.

AR 414.

In his appeal letter, the plaintiff also mentioned his mental health impairments, citing his attending physician's assessment of Class 5 in the Psychological Function category, which is consistent with a "significant loss of psychological, . . . personal and social adjustment – severe limitations." AR 277. Dr. Patricia Pearson, a psychologist who evaluated Lanier for Social Security disability, diagnosed him with severe generalized anxiety, severe depressive disorder secondary to physical pain and limitations, and severe pain disorder with psychological factors associated with a general medical condition, concluding as a result that Lanier would be unable to do customary work. AR 300. The plaintiff also cited testimony in the Social Security proceedings of vocational expert Elaine M. Tripi, Ph.D., who stated that "a finding of credibility with respect to the claimant's description of symptomatology and limitations in function would warrant the conclusion that he is unable to perform his past or any other work that exists in the community" and that a person with the claimant's residual functional capacity and vocational factors "would be unable to perform any jobs existing in significant numbers in the national economy." AR 322.

Based on this evidence, MetLife reversed itself and concluded on June 14, 2006 that the plaintiff was unable to work in any occupation. AR 443. MetLife also found evidence of radiculopathy, which exempts the plaintiff's case from the application of a twenty-four-month

limitation in the plan that exists for neuromusculoskeletal and soft tissue disorders. AR 19-20. MetLife reinstituted the plaintiff's LTD benefits effective April 7, 2006.

MetLife accounted for the Social Security benefits awarded to Lanier, as it had a right to do under the plan. Because the plaintiff received a retroactive payment of Social Security benefits to April 2003, MetLife claimed that it overpaid the plaintiff by $60,448.00 minus attorney's fees for the period from April 7, 2003 through December 6, 2005. Therefore, MetLife reduced Lanier's monthly payments by $1,990 that Lanier received from the Social Security Administration each month and further withheld all benefits starting January 2006 until it could recoup the entire $55,148 in overpaid benefits. Lanier compensated MetLife for overpayment on January 12, 2006, and the payment of benefits resumed. AR 301. Social Security benefits appears to be the plaintiff's only income at the present time.

However, about eight months after it had reversed its denial of benefits, on February 6, 2007, MetLife again terminated the plaintiff's LTD benefits effective that day. It does not appear that the decision was based on any new medical evidence or a change in the plaintiff's condition. Rather, MetLife's change of mind this time was justified by the opinions of new experts it had engaged to review the existing file materials.

Relying on the opinion of a MetLife Clinical Specialist and a new report by vocational rehabilitation consultant Mary L. Hale dated January 18, 2007, MetLife concluded that "there is no medical [evidence] to support that you have a less than sedentary capacity." AR 422. The revocation letter cited Dr. Seidel's August 25, 2005 letter (which Dr. Seidel already had repudiated by that time) and represented that Dr. Seidel opined that the plaintiff could sit intermittently for six

hours.  The letter went on to discredit the rest of Dr. Seidel's notes and progress reports as not

supported by hard medical evidence.

The new Hale physical capacity report appears to be based on the erroneous view of Dr.

Seidel's prior letter as well.  Hale wrote:

> Medical information used for this assessment includes the Attending Physician
> Statement and functional capabilities provided by Physical Medicine and
> Rehabilitation (PM&R) doctor, G. Seidel, and the Board Certified PM&R
> Independent Physician Consultant review dated 5/3/06.  Doctor Seidel provided the
> following restrictions and limitations: sit 4 hrs and stand, walk each 1 hour
> intermittently; lift and carry up to 10 lbs occasionally; no climbing, twisting, bending
> or stooping.  Mr. Lanier can reach, handle, finger, push, pull, and operate a motor
> vehicle.  A MetLife Nurse Consultant found that medical in the file to supports [sic]
> an ability for Mr. Lanier to function at the level, provided by the doctor, for an 8
> hours [sic] work day.

AR 425.  Hale then concluded that the plaintiff could perform several sedentary jobs.

Once again, Lanier appealed the decision to cancel his benefits in a letter dated August 2,

2007.  He raised the error of relying on Dr. Seidel's August 25, 2005 letter; attached a new attending

physician statement by Dr. Seidel dated February 21, 2007, in which Dr. Seidel opined that the

plaintiff was limited to one hour of sitting, standing, and walking; furnished a new doctor's note by

Seidel dated February 19, 2007, in which Dr. Seidel noticed no improvement in the plaintiff's

health; and argued that MetLife failed to take into consideration other information that he submitted

in his March 6, 2006 appeal, including the outcome of a Social Security disability proceeding.  Dr.

Seidel's letter repeated the diagnoses of "chronic cervical pain, chronic lumbar pain, and

intrascapular pain of myofascial in nature" with "multiple disc abnormalities in the cervical spine,

but no active cervical radiculopathy" and with "active left L5-S1 radiculopathy with pain extending

to the left gluteal, left posterior thigh."  AR 262.  He also wrote that the plaintiff suffered from

"chronic anxiety, depression, and paranoia" in addition and "has been having difficulty with the sleep-wake cycle." *Ibid.* Dr. Seidel estimated the plaintiff's physical limitations as follows:

> sitting tolerance is 15 to 20 minutes and he must get up, reposition, lie down, and walk for a few minutes. He is unable to work at his computer at home for more than 20 minutes and he has spasms that occur in the back of his neck. When he sits too long, he has increased pain in the back of the leg and then has to lie down. He has inability to bend, stoop, and twist of the lower back. He has difficulty coping from an emotional perspective. He feels very nervous, very anxious, very depressed.

*Ibid.*

MetLife referred the plaintiff's appeal to two Medical Consultants, Dr. Reginald Givens, a psychiatrist, and Dr. Sankar Pemmaraju, a physical medicine specialist. Both physicians conducted a records review and neither examined nor talked to the plaintiff. On August 21, 2007, Dr. Givens acknowledged that "[i]n general, progression of symptoms has been towards continued complaints of depression and anxiety" and diagnosed the plaintiff with depressive and anxiety disorders. AR 222. But ultimately, he concluded that there was insufficient evidence to support functional limitations of the plaintiff as of February 7, 2007. AR 222-23. He criticized Dr. Seidel's diagnosis and statement of limitations because Dr. Seidel did not perform any cognitive testing.

On the same day, August 21, 2007, Dr. Pemmaraju likewise found a lack of medical information supporting functional limitations of the plaintiff. He wrote a report in which he pointed to the lack of a formal functional capacity examination. Dr. Pemmaraju's comments follow:

> There is no indication from the available clinical documentation/information of the patient having any significant or severe positive objective findings that will be accounting for the multiple pain issues in multiple body segments. There was mention that electrodiagnostically there was bilateral ulnar neuropathy as well as lumbar radiculopathy occurring, but these findings did not correlate with significant or severe functional limitations based on the available medical documentation/information. There was also no documented functional measures detailing the patient's overall objective work abilities including overall patient effort as well as validity of testing. The records indicated the patient has mostly subjective

pain complaints without significant or severe positive objective findings to account for the persistent pain issues and this is not enough to justify continued time off from work or work restrictions.

AR 219.

On August 24, 2007, MetLife forwarded both Dr. Pemmaraju's and Dr. Givens's reports to Dr. Seidel seeking comment. Dr. Seidel responded in a letter dated August 28, 2007, but apparently MetLife did not receive or consider it. Instead, on September 6, 2007, MetLife denied the plaintiff's administrative appeal. MetLife's denial-of-benefits letter included the following language:

> [W]ith the medical records available for review, we concluded that the file did not contain any severity of impairment that resulted in functional limitations and restrictions preventing you from performing sedentary level of employment beyond February 6, 2007.

> In completing our review, we have determined that although you have medical conditions that support you having restrictions and limitations, you would be able to perform sedentary level work. Your symptoms and diagnoses would not prevent you from performing the alternate occupations identified with alternate employers. Therefore, our original decision to terminate your long-term disability benefits beyond February 6, 2007 was appropriate.

AR 202.

In his August 28, 2007 letter to MetLife, Dr. Seidel disagreed with Dr. Pemmaraju's findings. Dr. Seidel stated that he only received Dr. Pemmaraju's letter for review; Dr. Givens's letter was not sent. Dr. Seidel noted that Dr. Pemmaraju was not provided with a complete medical record and he "ignore[d] many clinical findings." AR 195. Seidel explained that his patient has not had a full functional capacity evaluation because no one was willing to pay for it. Dr. Seidel performed yet another examination of Mr. Lanier and reconfirmed his prior opinion that Lanier "is completely disabled." AR 198. After reviewing his clinical records and medical test results, Dr. Seidel repeated his list of the plaintiff's impairments:

-10-

1.      Chronic cervical pain.
2.      Chronic lumbar pain.
3.      Left lumbosacral radiculopathy.
4.      Right cervical radiculopathy.
5.      Fibromyalgia.
6.      Dysfunctional sleep-wake cycle.
7.      Objective reduced range of motion of the cervical spine, mild reduction in range of motion of the right shoulder, objective reduction in range of motion of the lumbar spine, and objective atrophy noted in the right upper extremity and left lower extremity.
8.      Radiographic evidence of advanced severe degenerative joint disease of the cervical spine and lumbar spine in excess of what would be expected for age.

AR 197-98. Dr. Seidel then ordered another MRI of Lanier's cervical and lumbar spine and electrodiagnostic testing of Seidel's upper and lower extremities.

MetLife considered this letter but was unpersuaded. On September 20, 2007, MetLife wrote that Dr. Seidel's letter did not provide any "additional objective clinical documentation," and "this additional information did not change our original appeal determination." AR 194. MetLife declared that the plaintiff had exhausted administrative remedies and no further appeals would be considered.

On October 9, 2007, MetLife received the electrodiagnostic studies of the plaintiff's upper and lower extremities that Dr. Seidel ordered along with a letter from Dr. Seidel dated October 1, 2007. The nerve conduction study of upper extremities showed "no electrodiagnostic evidence of bilateral median mononeuropathy or carpal tunnel syndrome," "electrodiagnostic evidence of worsening bilateral ulnar neuropathy at cubital tunnel [but] no active axonal loss," and "no electrodiagnostic evidence of bilateral cervical radiculopathy or plexopathy." AR 181. The nerve conduction study on lower extremities demonstrated:

1.      Abnormal study.
2.      Right L5-S1 radiculopathy without active axonal loss. Motor units are larger polyphasia still present.

3.   No electrodiagnostic evidence of sensory and motor peripheral polyneuropathy.

4.   No electrodiagnostic evidence of right lumbrosacral radiculopathy or plexopathy.

AR 186.

The plaintiff underwent a new MRI on September 18, 2007, which revealed the following:

Minimal retrolisthesis, mixed biforaminal protrusions and a small central protrusion at the C4-C5 level slightly flattens the vental cord, slightly effaces the exiting right and abuts the exiting left C5 nerves.

Mixed biforaminal protrusions, right greater than left. Flatten the right side of the ventral cord at C5-C6 level.

Mild retrolisthesis and mixed broad-based displacement slightly flatten the ventral cord at C6-C7 level and abut bilateral exiting C7 nerves. No abnormal enhancement is identified.

AR 188.

Dr. Seidel's letter of October 1, 2007 recounted a variety of the plaintiff's abnormalities. Dr. Seidel described the results of the most recent MRI as follows: "MRI of the cervical spine revealed numerous diagnostic abnormalities and the reports do speak for themselves for the cervical spine and lumbar spine, but at every level of the cervical spine there are disc abnormalities." AR 192. "In the lumbar region there is Schmorl's nodes or disc herniation into the bony surface, superior endplate of L2 and L4. In the cervical region, there is loss of cervical lordosis. In the lumbar region, there is loss of cervical lordosis." *Ibid.* Dr. Seidel also lowered his estimate of the plaintiff's functional capacity, concluding that the plaintiff "is not capable of tolerating sitting for more than 20 to 30 minutes at a time. He needs to change positions frequently. He is not able to tolerate standing. He is not able to tolerate bending, stooping, or twisting. He is not capable of repetitive use of his arms in terms of pushing or pulling." *Ibid.*

MetLife refused to consider the new information, stating that since LTD claim was terminated on February 7, 2007, the tests results from September 2007 "could not assist in supporting a severity of [the plaintiff's] condition that would have prevented [him] from performing sedentary work beyond February 7, 2007." AR 175.

Thereafter, the plaintiff commenced the present action. Both sides filed cross motions on the administrative record.

<center>II.</center>

The plaintiff challenges the denial of benefits pursuant to section 502(a)(1)(B) of ERISA, which authorizes an individual to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Regardless of the language of the plan that the administrative decision is "final and binding," section 502 of ERISA affords participants of the plan a judicial remedy. *Adams v. Ford Motor Co.*, 847 F. Supp. 1365, 1377 (E.D. Mich. 1994). In such an action, the Court should consider only the evidence presented to the plan administrator at the time he or she determined the employee's eligibility. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). The Court's review is limited to the administrative record. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998). However, the Court "may consider evidence outside of the administrative record . . . if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Id*. at 619.

"[A] plan administrator's decision is reviewed 'under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Shelby County Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933 (6th Cir. 2000) (quoting *Firestone Tire & Rubber Co.*, 489 U.S. at 115). Where, as here, "the benefit plan does grant such discretionary authority, the plan administrator's decision to deny benefits is reviewed under the 'arbitrary and capricious' standard of review." *Shelby County Health Care Corp.*, 203 F.3d at 933; *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (en banc). The section of the KPMG Consulting Employee Benefit Plan dealing with long-term disability benefits vests the plan administrator and other plan fiduciaries with considerable discretionary authority to interpret the terms of the plan and determine eligibility for and entitlement to plan benefits in accordance with the terms of the plan. *See* AR 33. The parties agree, and the Court finds, that the arbitrary and capricious standard of review applies. *Roberson v. Gen. Motors Corp., Detroit Diesel Allison Div.*, 801 F.2d 176, 180 (6th Cir. 1986).

"The arbitrary or capricious standard [of review] is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotation marks and citations omitted). An administrator's decision will be upheld under the arbitrary and capricious standard "if it is the result of a deliberate, principled reasoning process, and is rational in light of the plan's provisions." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (internal quotation marks and citations omitted). A decision reviewed under this standard must be upheld if it is

supported by "substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). Substantial evidence to support an administrator's decision exists if the evidence is "rational in light of the plan's provisions." *See Smith v. Ameritech*, 129 F.3d at 863 (internal quotation marks and citation omitted). As a general rule, where a plan administrator "chooses to rely upon the medical opinion of one doctor over that of another . . . the plan administrator's decision cannot be said to have been arbitrary and capricious." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003).

However, the arbitrary and capricious standard of review "is not . . . without some teeth." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (quotation marks and citation omitted). The administrator's decision may be arbitrary and capricious if it relies on an interpretation of the plan that found no support in the text, *see Haus v. Bechtel Jacobs Co.*, 491 F.3d 557, 564 (6th Cir. 2007), or where the administrator "cherry-pick[s evidence] in hopes of obtaining a favorable report." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). "[T]he arbitrary-and-capricious standard of review is not a 'rubber stamp [of] the administrator's decision.'" *Cooper*, 486 F.3d at 165 (quoting *Jones v. Metro Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)). "The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously 'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Evans*, 434 F.3d at 876 (citing *McDonald*, 347 F.3d at 172).

Although courts recognize that the interests of the insurance company are generally in conflict with the interests of a claimant, *see Gismondi v. United Techs. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005), existence of a conflict of interest "shapes" the application of, but does not change,

the arbitrary and capricious standard of review. Further, the degree of deference afforded the decision-maker under either standard is considerable, and many of the decisions use the terms interchangeably. For example, the Sixth Circuit has noted that:

> [b]ecause an insurance company pays out to beneficiaries from its own assets rather than from the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business, and the conflict of interest is substantial. . . . The court in *Brown* held that the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest.

*Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir.1991) (citing *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1561-63 (11th Cir.1990)) (internal citations omitted); *see also Firestone Tire & Rubber Co.*, 489 U.S. at 115 ("Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'") (citation omitted). Mere allegations of the existence of a structural conflict of interest are not enough for the court to reject a plan administrator's denial of benefits where there is substantial evidence in the administrative record that supports his or her decision; there must be some evidence that the alleged conflict of interest actually affected the plan administrator's decision to deny benefits. *See Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998) ("Because our review of the record reveals no significant evidence that SummaCare based its determination on the costs associated with Mrs. Peruzzi's treatment . . . we cannot conclude that SummaCare was motivated by self-interest in this instance."); *see also Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir.1998) ("We presume that a fiduciary is acting neutrally unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict."); *Sullivan v. LTV Aerospace & Def. Co.*, 82 F.3d 1251, 1259 (2d Cir.1996) ("[A] reasonable interpretation of

the Plan will stand unless the participants can show not only that a potential conflict of interest exists, . . . but that the conflict affected the reasonableness of the Committee's decision.") (internal quotation and citations omitted).

The Supreme Court recently reinforced the idea that a conflict of interest exists when a plan administrator both evaluates claims for benefits and pays benefits claims. *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2349-50 (2008). The Court instructed lower courts to consider a structural conflict of interest, but counseled that the weight accorded to that factor should vary depending on the circumstances of the case.

> The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits.

*Glenn*, 128 S. Ct. at 2351 (citations omitted).

MetLife's argument in this case is straightforward: it relied on evidence from medical consultants, who rationally concluded that no objective evidence supported the level of disability Dr. Seidel found to exist. MetLife contends that it had a right to insist on objective medical evidence to support the claim of disability. Since it based its decision on the opinions of medical consultants, MetLife reasons, its determination that the plaintiff could perform a range of sedentary work – and therefore was not disabled within the plan's definition – could not be arbitrary or capricious.

The Court finds problems with this argument on several levels. *First*, it bears noting that in many cases where a claimant bases an allegation of disability on a diagnosis of fibromyalgia, difficulty arises over the lack of objective findings, because that ailment is difficult to correlate with objectively observable, physical manifestations. *See, e.g., Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817-18 (6th Cir. 1988) (observing that, "[a]s set forth in the two medical journal articles . . . fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. . . . [I]t is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients"); *Clark v. Aetna Life Ins. Co.*, 395 F. Supp. 2d 589, 609 (W.D. Mich. 2005) (citing *Gaffney v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 733, 736 (E.D. Mich. 2003)). Lanier's case, however, is not one of those. The plaintiff here presented with multiple ailments – many objectively confirmed though imaging studies – that explain his reported limitations.

Although the plan requires a claimant to "provide documented proof of your Disability," AR 23, the plan does not specify that the documentation include "objective evidence." *See Boone v. Liberty Life Assurance Co. of Boston*, 161 F. App'x 469, 472 (6th Cir. 2005) (unpublished) (requirement of furnishing "objective medical evidence" is contained in the plan and has to be observed); *Iley v. Metro. Life Ins. Co.*, 261 F. App'x 860, 862 (6th Cir. 2008) (unpublished) (the plan required claimants to present objective clinical findings of nerve pathology to be eligible for disability benefits based on radiculopathy); *Oody v. Kimberly-Clark Corp. Pension Plan*, 215 F. App'x 447, 452 (6th Cir. 2007) (unpublished) (insisting on objective medical evidence to support claim of disability in the plan). Nevertheless, Sixth Circuit precedent "suggests that it is entirely reasonable for an insurer to request objective evidence of a claimant's functional capacity." *Rose*

*v. Hartford Fin. Servs. Group, Inc.*, 268 F. App'x 444, 453-454 (6th Cir. 2008) (unpublished) (collecting cases). A formal functional capacity assessment, however, is not the only objective proof of a claimant's limitations. A qualified physician can correlate clinical findings with the results of objective medical testing to render an opinion on the ability of an individual to perform certain tasks. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286 (6th Cir. 2005) (reversing denial of benefits because independent physician reviewing file focused only on subjective reports of pain and disregarded objective tests and a functional capacity assessment of Social Security Administration that concluded claimant could not perform sedentary work); *Patrick v. Hartford Life & Accident Ins. Co.*, 543 F. Supp. 2d 770, 777-78 (W.D. Mich. 2008). That appears to be precisely what Dr. Seidel did in this case.

*Second*, the conclusions of the medical consultants, particularly Dr. Pemmaraju, are inconsistent with the medical record and contain some internal inconsistencies as well. Dr. Pemmaraju discounted Dr. Seidel's reports as a mere reflection of the plaintiff's subjective complaints. However, Dr. Pemmaraju recognized multiple abnormalities reported in the imaging studies, which unquestionably are objective test results; he concluded nonetheless that the plaintiff's complaints are "mostly subjective" and lack "significant or severe positive objective findings to account for the persistent pain issues." AR 219. Dr. Pemmaraju relied heavily on the 2003 MRI results when he had at his disposal the results of more recent 2005 MRI tests which, according to Dr. Seidel, demonstrated deterioration of the plaintiff's condition. Finally, Dr. Pemmaraju discounted on a wholesale basis Dr. Seidel's conclusions regarding the diminished functional capacity of the plaintiff and concluded somewhat randomly that the claimant can perform "at least at a medium duty work activity level." AR 219. In doing so, Dr. Pemmaraju does not attempt to

explain the error in Dr. Seidel's characterization that the plaintiff "is not capable of tolerating sitting for more than 20 to 30 minutes at a time." AR 192. As Dr. Seidel explained, the plaintiff

> deals with chronic radicular symptoms and has had electrodiagnostic evidence of correlating anatomical abnormalities with multiple impairments in the cervical and lumbar region that are objective in nature. He has had congenital narrowing of the spinal canal in the lumbar region, degenerative changes in left neuroforamen at L3-L4, left paracentral disc protrusion at L4-L5, facet arthrosis at multiple levels. This is a situation that is compatible with advanced degenerative arthritis of the lumbar spine at multiple levels and can be symptomatic. He has electrodiagnostic evidence of a chronic left L5-S1 radiculopathy that correlates with those anatomic findings.

AR 195-96. Instead, Dr. Pemmaraju implicitly suggested that the plaintiff could work an entire eight-hour day. This consultant, in essence, made credibility findings concerning the plaintiff's complaints without acknowledging and dealing with all of Dr. Seidel's diagnoses or examining the plaintiff.

The Sixth Circuit held in a similar case that although there is nothing improper in relying on a file review that disagrees with the conclusions of a treating physician, reliance on such review is inadequate where, as here, "conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology." *Calvert*, 409 F.3d at 297 n.6. Even though the array of objective evidence of abnormalities is present in the record, Dr. Pemmaraju simply doubts that someone with all of the conditions enumerated in the report could have the kind of pain that would prevent him from performing sedentary work. Notably, Dr. Pemmaraju omits any mention of fibromyalgia with which the plaintiff has been diagnosed – a condition that can be painful and difficult to detect with objective means, as noted earlier. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n.3 (6th Cir. 2007) (stating that a growing number of courts recognized that fibromyalgia is a disabling impairment that is not susceptible of verification by traditional means). And although the plan gives MetLife authority to conduct

medical examinations, Dr. Pemmaraju makes his conclusions about the plaintiff's credibility without interviewing the plaintiff or the plaintiff's treating physician and without the benefit of a full functional capacity evaluation, the absence of which he used to impeach Dr. Seidel's report. *See Calvert*, 409 F.3d at 295 (considering the decision to forego personal examination of a claimant as one of the factors in the overall assessment of the decision for arbitrariness and capriciousness).

*Third*, neither the consultants nor MetLife's assessors mentioned the Social Security Administration's finding of disability. It is true that qualifying for Social Security disability benefits does not necessarily mean that a claimant would qualify for LTD benefits under a particular ERISA plan. *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005). This is so because the Social Security disability program and ERISA benefit plans have certain "critical differences" stemming from obligatory nature of one program and voluntary nature of the other. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). Further, ERISA plans are not uniform, and the administrator must administer benefits in accordance with the goals of each individual plan. *Spangler*, 313 F.3d at 361. Nonetheless, the Social Security Administration's decision is "far from meaningless." *Calvert*, 409 F.3d at 294. In a situation where the plan administrator encourages the applicant to apply for Social Security benefits and financially benefits from the applicant's receipt of them, the plan administrator should explain why it is taking a position different from the Social Security Administration, and its failure to do so may be weighed in favor of finding that the decision was arbitrary and capricious. *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 446 (6th Cir. 2009) (citing *Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 554 (6th Cir. 2008)). The case for arbitrariness is especially strong where failure to explain the

deviation from the SSA findings is coupled with some degree of conflicting interests. *DeLisle*, 558 F.3d at 446 (citing *Glenn*, 128 S. Ct. at 2352).

In this case, there was testimony from a vocational expert in the Social Security proceedings that discussed the plaintiff's vocational capacity. Dr. Elaine Tripi testified that if the plaintiff's description of his pain were credible, he could not perform work at any exertional level. The finding satisfies the plan's definition of disability. Although MetLife did not have to accept that finding, it also was not at liberty to ignore it altogether.

*Fourth*, it appears that MetLife gave no weight to Dr. Seidel's opinions. Seidel was a treating doctor who actually examined and cared for the plaintiff. The Supreme Court has held that unlike Social Security cases, there is no automatic deference required of plan administrators for treating physicians. *Black & Decker Disability Plan*, 538 U.S. at 834 ("courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). However, the Supreme Court was also careful to point out that where reliable, opinions of a treating physician must be given appropriate weight. *Ibid.*

Courts have endorsed the practice adopted by many insurance companies to refer a claimant's file for review by an independent physician (or even a nurse), even if that physician does not conduct a physical examination of the claimant but relies on the review of a file instead. *Calvert*, 409 F.3d at 296; *Boone*, 161 F. App'x at 473-74 (approving practice of review by nurse). However, when assessing a non-treating physician's opinion, the Sixth Circuit developed certain common-sense guidelines,

the court may consider several factors, including: (1) whether the reviewing physician has a conflict of interest, *Moon* [*v. Unum Provident Corp.*], 405 F.3d [373, 381-82 (6th Cir. 2005)]; (2) whether the administrator decided that the physician should conduct a file review rather than a physical exam, particularly when it has the right to require a physical exam, *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 295 (6th Cir. 2005); and (3) whether the non-treating physician's conclusion makes a "critical credibility determination[] regarding a claimant's medical history and symptomology" without observing the claimant, *id.* at 297.

*Houston v. Unum Life Ins. Co. of Am.*, 246 F. App'x 293, 301-02 (6th Cir. 2007) (footnote omitted). Especially where the plan administrator reserved a right to obtain an independent medical examination of the claimant but chose not to, relying instead on the opinion of a reviewing physician who, without personally meeting with the claimant, doubted the credibility of his complaints of pain, the administrator's decision to forego physical examination is a factor that weighs in favor of finding the decision to be arbitrary and capricious. *Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 395-96 (6th Cir. 2009) (finding that "where an administrator exercises its discretion to conduct a file review, credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary"); *see also Smith v. Continental Cas. Co.*, 450 F.3d 253, 263-64 (6th Cir. 2006); *Evans*, 434 F.3d at 878-79 (citing *Calvert*, 409 F.3d at 297).

The justification for rejecting Dr. Seidel's opinions appears to be a lack of objective verification, as mentioned by the consulting medical file reviewers and other claim processors. But as discussed above, the record does not support that criticism. Nor do the circumstances of the file review support the credibility determinations that were inherent in the ultimate decision to deny benefits. The selection of Dr. Pemmaraju's opinion of the severity of the plaintiff's limitations over Dr. Seidel's appears to be nothing more than arbitrary.

*Fifth*, the manner in which the defendant processed this claim leads to the conclusion that its denial of benefits was influenced by its conflicting interests and was arbitrary. The defendant

determined in June 2006 that the plaintiff was disabled within the meaning of the plan and was entitled to continuation of his LTD benefits beyond the initial thirty-six months. The defendant presented no evidence of improvement in the plaintiff's condition to account for the reversal of its position only eight months later. To the contrary, the plaintiff's previous MRI reports revealed worsening of his degenerative disc disease and spinal stenosis from 2003 to 2005, and the new test performed on September 16, 2007 revealed disc abnormalities "at every level of the cervical spine." AR 192. Although the first grant of LTD benefits does not entitle the plaintiff to those benefits throughout his normal work life, it is only reasonable that some new evidence calling into doubt the continuing disability of the claimant is necessary to justify the change of course. *See, e.g., Rose*, 268 F. App'x at 447 (the results of surveillance of the plaintiff were sufficient to discontinue benefits). Instead, the defendant relied on Mary Hale's consultative report dated January 18, 2007, which in turn was based on Dr. Seidel's August 2006 report that had been repudiated. When the plaintiff appealed the determination a second time, the defendant engaged medical consultants whose review of the medical record was somewhat selective, giving the impression that they "'cherry-picked' [his] file in hopes of obtaining a favorable report." *Spangler*, 313 F.3d at 362; *see also Nord*, 538 U.S. at 832 (acknowledging that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements") (quotation marks and citation omitted); *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 507-08 (6th Cir. 2005) ("This court has similarly observed that a plan administrator, in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a 'clear incentive to contract with individuals who were inclined to find in its favor that [a claimant] was not entitled to continued

-24-

[disability] benefits.'") (quoting *Calvert*, 409 F.3d at 292). This approach suggests that the defendant's interest in the claim of this relatively young man extended beyond discharging its fiduciary obligations to the plan and all its participants and beneficiaries under 29 U.S.C. § 1104. The inference is unavoidable that the defendant yielded to the "perpetual conflict with its profit-making role as a business," requiring the "arbitrary and capricious standard" to "be shaped by the circumstances of the inherent conflict of interest." *Miller*, 925 F.2d at 984.

The Court finds that the defendant's second reversal of its position – resulting in the denial of LTD benefits to the plaintiff – was arbitrary and capricious.

III.

The Court concludes that the defendant's decision finding the plaintiff not disabled within the meaning of the KPMG Consulting, Inc. employee benefits plan cannot be sustained on this record even under the most deferential review standard.

Accordingly, it is **ORDERED** that the plaintiff's motion to reverse the decision of the defendant plan administrator [dkt #15] is **GRANTED**.

It is further **ORDERED** that the defendant's motion to affirm the decision of the plan administrator [dkt #17] is **DENIED**.

It is further **ORDERED** that the matter is remanded to the defendant plan administrator with directions to pay benefits in accordance with the KPMG Consulting, Inc. long term disability benefits plan.

<div style="margin-left:40%">

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

</div>

Dated: March 9, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 9, 2010.

s/Teresa Scott-Feijoo

TERESA SCOTT-FEIJOO